UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-62142-CIV-MARRA/HOPKINS

JEFFREY ANTHONY BENJAMIN,

      Plaintiff,

vs.

HOLY CROSS HOSPITAL, Inc.,
a Florida corporation,

      Defendant.

_____/

### ORDER AND OPINION

THIS CAUSE is before the Court upon Defendant's Motion for Summary

Judgment Directed to All Claims Set Forth in Plaintiff's Amended Complaint [DE 73].

The Court has carefully considered the motion, Plaintiff's response after having been

given notice of the motion in accordance with *Griffith v. Wainwright*, 772 F.2d 822,

824 (11th Cir. 1988), the reply, all other materials filed in support of or in opposition

to the instant motion, and is otherwise fully advised in the premises.

Jeffrey Anthony Benjamin ("Benjamin"), proceeding *pro se,* has filed an

Amended Complaint ("Complaint" or "Compl.") against his former employer, Holy

Cross Hospital, Inc. ("Holy Cross" or "Defendant"), in an attempt to set forth claims

for breach of contract (Count 1), fraud (Count 2), violation of the Federal Equal Pay

Act (Count 3), harassment and hostile work environment in violation of Title VII

(Count 4), race discrimination in violation of 42 U.S.C. § 1981 (Count 5), violation of

the Florida Equal Pay Act (Count 6), and retaliation under Title VII (Count 7).

Defendant moves for summary judgment on all counts asserting that the undisputed

record evidence demonstrates that there are no genuine issues of material fact and it

is entitled to judgment as a matter of law.

**Undisputed Material Facts**

1.   Mr. Benjamin, "a Black man in America," was employed by Holy Cross as the

     Chief EEG Technician from approximately August 11, 2008 to July 12, 2011.  At

     all relevant times, Benjamin was assigned to the Neurology Department.

     Compl. ¶¶ 5 and 8; deposition of Jeffrey Anthony Benjamin (hereinafter

     "Benjamin Depo.") at 106; Affidavit of Rachel Thompson (hereinafter

     "Thompson Aff.") ¶ 4.

2.   At all relevant times, Benjamin was employed by Holy Cross on an "at will"

     basis.  Thompson Aff. ¶ 5.

3.   Upon commencing his employment with Holy Cross, Benjamin was paid on an

     hourly basis, at a rate of $27.00 per hour.  Compl. ¶ 31; Benjamin Depo. 22;

     Thompson Aff. ¶ 17.

4.   After his second week on the job, on August 21, 2008, Benjamin received his

     first paycheck, covering the period of August 11, 2012 to August 16, 2012,

     which reflected his pay rate, $27.00 per hour.  Compl. ¶ 31; Benjamin Depo.

     22; Thompson Aff. ¶ 7.

5.  Benjamin immediately complained to his supervisor, Joan Steele, that the hourly rate reflected on his initial paycheck was incorrect.  Benjamin Depo. 22.  He advised Ms. Steel that he had been offered and agreed to a rate of $29.00 and not $27.00 per hour.  Benjamin Depo. 23.  Benjamin then raised the same complaint with Human Resources.  Benjamin Depo. 23-24.

6.  In response to his complaint, Benjamin was advised by Ms. Steele and by Human Resources, that the rate reflected on his paycheck, $27.00 per hour, was the rate that had been approved by Luisa Gutman, Senior Vice President of Human Resources, and would not be changed.  Benjamin Depo. 22-24.

7.  After being notified of the "rate change," and notwithstanding the discrepancy between what he believed he should have been paid and what he actually was paid, Benjamin continued his employment with Holy Cross for three years, through July 12, 2011, at the rate of $27.00 per hour.  Benjamin Depo. 24-25 .

8.  During his employment with Holy Cross, Benjamin was the only regular full-time associate employed as an EEG Technician in the Neurology Department. Thompson Aff. ¶ 10.  The other EEG Technicians in the Neurology Department were "PDP Associates," employed on a "per diem" basis.  Thompson Aff. ¶ 10.

9.  Unlike regular full-time associates, PDP Associates at Holy Cross are not guaranteed a set number of hours (or any hours).  They are hired to work on an as needed basis, they are not eligible for health, dental, or life insurance

benefits, paid time off or disability income benefits, or other benefit time aside from shift differential, weekend differential, and holiday differential.  As a result, the hourly rates paid to PDP Associates are typically higher than the hourly rates paid to regular full-time associates.  Within the Neurology Department PDP Associates employed as EEG Technicians are paid a standard rate of $30.00 per hour.  Thompson Aff. ¶ 11.

10.    Holy Cross does not restrict the PDP Associate classification to women, and it employs both men and women as PDP Associates throughout the hospital. Thompson Aff. ¶ 12.

11.    In his Complaint, Benjamin identifies three women who worked within the Neurology Department as EEG Technicians who were compensated at higher hourly rates than he was:  Lorraine Tidwell, Diana Corredor, and Deborah Daley.  Compl. ¶¶ 61-72, 123-133.

12.    Lorraine Tidwell was neither a regular full-time associate nor a PDP Associate. Rather, Ms. Tidwell was an independent contractor with Holy Cross.  Ms. Tidwell provided services on an as needed basis at contract rates.  Holy Cross received regular periodic invoices from Ms. Tidwell for services provided and it paid the invoices when due.  Thompson Aff. ¶ 14.

13.   Ms. Tidwell has signed an affidavit[1] that she "refused an offer to be the full-

time EEG Tech at Holy Cross Hospital at an hourly rate of 30.00 ++ in 2008 from

Joanne Steel. . .   That I did refer Jeffrey Benjamin to Joan Steel for

employment as an EEG Tech in 2008."  DE 90 at 3.

14.   Diana Corredor, a Hispanic woman, was an EEG Technician/PDP Associate

employed within the Neurology Department from March 23, 2009 to December

21, 2009.  Thompson Aff. ¶ 15.  At all times during her employment, she was

paid at the standard PDP Associate rate of $30.00 per hour.  Thompson Aff. ¶

15; Benjamin Depo. 36.

15.   Deborah Daley, a Caucasian woman, was an EEG Technician/PDP Associate

employed within the Neurology Department from July 27, 2009 to the present.

Thompson Aff. ¶ 16.  At all times during her employment she has been paid at

the standard PDP Associate rate of $30.00 per hour.  Thompson Aff. ¶ 16;

Benjamin Depo 33-34, 108.

16.   Wanda Cardona was identified by Benjamin in his deposition as someone who

was paid $30 or more per hour who was not per diem.  Ms. Cardona is Hispanic,

---

[1]  The Affidavit of Lorraine Tidwell fails to comply with the technical
requirements of § 117.05(4), Florida Statutes.  Section 117.05(4) requires that a
notary complete a jurat or notarial certificate in which the notary verifies that he or
she "personally knows, or has satisfactory evidence, that the person whose signature
is to be notarized is the individual who is described in and who is executing the
instrument."  The Affidavit of Lorraine Tidwell contains no such jurat or certificate.

she started with Holy Cross after Benjamin left, and she is currently employed

as an Epilepsy Tech.  Thompson Aff. ¶ 20; Benjamin Depo. 34.

17.     During his employment, Benjamin worked with each of the 14 neurologists in

the Neurology Department, including Dr. Eduardo Locatelli, a Hispanic man of

Argentinian descent.  Benjamin Depo. 39.

18.     Overall, Benjamin spent less than 10 percent of his time working with Dr.

Locatelli and on Dr. Locatelli's patients.  Benjamin Depo. 40.  Prior to January

2010, however, Benjamin's interactions with Dr. Locatelli were even more

infrequent.  Benjamin Depo. 50.

19.     According to Benjamin, in December 2009, Diana Corredor, a Hispanic woman,

resigned from her employment with Holy Cross, because Dr. Locatelli was

"verbally abusive" toward her, "harassed" her, and she was "unwilling to work

in those conditions."  Benjamin Depo. 52-53.

20.     According to Benjamin, Dr. Locatelli was also "verbally abusive" to Wanda

Cardona, a Hispanic woman who worked in the Neurology Department as an

Epilepsy Tech and who made several complaints about Dr. Locatelli to Joan

Steele.  Benjamin Depo. 53-54, Thompson Aff. ¶ 20.

21.     According to Benjamin, "It is well known in the EEG world around techs in

south Florida, Dr. Locatelli is the one person you do not want to work with.

He's verbally abusive."  Benjamin Depo. 55.

22.   In January 2010, Benjamin felt that Dr. Locatelli became verbally abusive toward him.  During his deposition, Benjamin recalled three instances of "verbal abuse" all of which he testified occurred in January 2010: (a) on or about January 11, 2010, Dr. Locatelli raised his voice and made unflattering comments about Joan Steele, Benjamin's Caucasian supervisor, while wagging his finger at Benjamin (Benjamin Depo. 81-87); (b) on or about January 14, 2010, Dr. Locatelli used profanity to vent his frustrations at an elongated, entangled electrical cord in Benjamin's presence (Benjamin Depo. at 90-92); (c) on or about January 19, 2010, Dr. Locatelli telephoned Benjamin and asked him to perform an EEG "stat" that was apparently not ordered on a "stat" basis (Benjamin Depo. at 99-103); and (d) on two occasions, once on January 23, 2010, and again within a few weeks, Dr. Locatelli made a comment of unknown meaning and intent to Benjamin that Benjamin recalls included the words "hammer" and "head."  Benjamin Depo. at 62-63, 116-119.

23.   Benjamin also claims that he was subjected to physical abuse by Dr. Locatelli during the same time-period.  According to Benjamin, this physical abuse consisted of Dr. Locatelli, on one occasion, putting his hand on Benjamin's shoulder and moving him to the side when exiting the EEG reading room. Benjamin Depo. 64-65, 74-75, 123-124.

24.   Although Benjamin claims that he felt physically threatened by Dr. Locatelli and "feared for his life" when in Dr. Locatelli's presence, Benjamin never reported his alleged fear for his physical safety to anyone, including his supervisor, as he felt capable of physically defending himself should the opportunity present itself.  Benjamin Depo. 121-123.

25.   Benjamin cannot recall any specific instance of verbal or physical abuse by Dr. Locatelli directed toward him at any time from January 2010 to June 2010. Benjamin Depo. 126-127, 129.

26.   However after June 2010, Dr. Locatelli further harassed him by fabricating a story about him abandoning his job when Benjamin left his post for a ten minute period while conducting a long term EEG for one of Dr. Locatelli's patients.  Benjamin Depo. 139-143.  Benjamin also claims that Dr. Locatelli fabricated a story about him failing to call him to report a patient seizing. Benjamin Depo. 143-144.

27.   The final instance of harassment or abuse that Benjamin could recall occurred in October 2010.  Benjamin claims that he and Dr. Locatelli got "in each others' faces" and Dr. Locatelli raised his voice concerning arrangements made for Neurologists to read EEGs while the windows in the EEG reading room were being replaced.  Benjamin Depo. 144-146.

28.   Benjamin did not report this incident, and he could not recall during his
      deposition, any other instances of harassment or abuse by Dr. Locatelli from
      October 2010 through the date of Benjamin's separation from employment
      with Holy Cross.  Benjamin Depo. 147, 151-152.

29.   At no time during Benjamin's employment did Dr. Locatelli make any
      comments about Mr. Benjamin's race.  Dr. Locatelli never used racial slurs or
      epithets and never told racially insensitive jokes in Benjamin's presence.
      Benjamin Depo. 97.

30.   In response to the Motion for Summary Judgment, Benjamin submitted an
      affidavit of his girlfriend, Lauren Alexon.  Ms. Alexon avers that she witnessed
      "several harassing and verbally abusive telephone calls by Dr. Eduardo Locatelli
      to Jeffrey Benjamin."  Lauren Alexon Affidavit ("Alexon Aff."), DE 90, ¶ 12.
      Ms. Alexon provides no more information about the content of the calls.  She
      does not indicate what made the calls harassing or abusive.

31.   Ms. Alexon also avers that she overheard "derogatory racially insensitive
      statements about [Benjamin's] race and color of his skin, intelligence, work
      ethic, cleanliness and threats against Mr. Benjamin by Dr. Locatelli."  DE 90, ¶
      11.  Ms. Alexon does not provide any further information about these
      statements.

32.     Although he claims that Dr. Locatelli behaved differently with non-Black employees, Benjamin admittedly did not witness Dr. Locatelli's interactions with the other EEG Technicians or the Epilepsy Technicians that Dr. Locatelli supervised.  Benjamin Depo. 47, 97-99.

33.     Further, Benjamin has no evidence to suggest that Dr. Locatelli had an issue with him because he is Black, and has no evidence to suggest that Dr. Locatelli or Holy Cross, are racist or biased against any group.  Benjamin Depo. 105-106; 166-167.  Specifically, Benjamin testified:

Q:      You have no facts to suggest that the way you were treated had something to do with the fact that you are African American?

A:      I have no facts.  Absolutely no facts.

Q:      Okay.

A:      None.

Benjamin Depo. 167-168.

34.     The only action taken by Dr. Locatelli during Benjamin's employment that Benjamin can identify as having anything to do with race is that on several occasions Dr. Locatelli offered him a "bounce" or "fist bump" rather than a handshake.  While Benjamin testified that he believes the "bounce" is African American in origin, Benjamin also admitted that people of all races "bounce" each other.  Benjamin Depo. 95-96, 109-112.

35.   Dr. Locatelli wished for Benjamin to cross-train as an Epilepsy Technician so that he could also work in Dr. Locatelli's Epilepsy Unit.  Benjamin refused this invitation and advised Joan Steele that he would not cross-train in the Epilepsy Unit unless Holy Cross paid him more money.  Benjamin Depo. 76-77. Thereafter, Benjamin testified Dr. Locatelli's "only intent" toward him "was to have [him] fired from Holy Cross Hospital because he . . . couldn't manipulate him . . . to be at his beck and call."  Benjamin Depo. 104.

36.   In June 2011, Benjamin filed a charge of discrimination with the EEOC. Benjamin Depo. 165.  *See* Notice of Right to Sue at DE 22.

37.   On July 12, 2011, Benjamin sent an email to Rachel Thompson in HR entitled "Impending Resignation Due to continued Harrasment [sic] By Holy Cross Hospital and removal of tools to effectively complete my job on a daily basis and willful and malicious assination [sic] of my good character."  DE 101-10 (Def. Ex. 8); Benjamin Depo. 152-153, Thompson Aff. ¶ 17.  Benjamin's "contention" is that by using the word, "impending," he "was going to give them notice after [he] found another job to sustain" himself.  Benjamin Depo. 152-53.

38.   That same day, Ms. Thompson responded, "We received the email you sent today regarding your pending resignation.  While we strongly disagree with the facts as you set them forth, we respect your decision to resign and accept your

resignation effective immediately.  In lieu of notice period, we shall pay you for two weeks notice as is our customary practice.  As with any resignation, your director shall meet with you regarding any transitional matters."  DE 101-11 (Def. Ex. 9); Benjamin Depo. 176, Thompson Aff. ¶ 18.

39.    Benjamin has no specific knowledge or information that anyone from Holy Cross misrepresented the terms on which he was separated from his employment to the Agency for Workforce Innovation when notified of his claim for unemployment compensation benefits.  Benjamin Depo. 177-182.

40.    There is no evidence that Holy Cross provided information to the Agency for Workforce Innovation concerning Benjamin's separation.  Holy Cross did not challenge Benjamin's award of benefits and did not otherwise interfere with Benjamin's receipt of unemployment compensation benefits.  Benjamin Depo. 177-182, Thompson Aff. ¶ 19.

## STANDARD OF REVIEW

A court, in reviewing a motion for summary judgment, is guided by the standard set forth in Federal Rule of Civil Procedure 56(c), which states, in relevant part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).  The moving party bears the burden of meeting this exacting standard.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  That is, "[t]he moving party bears 'the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' "  *U.S. v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Celotex*, 477 U.S. at 323).  In assessing whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party.  *Batey v. Stone*, 24 F.3d 1330, 1333 (11th Cir. 1994).

The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  The nonmovant must present more than a scintilla of evidence in support of the nonmovant's position.  A jury must be able reasonably to find for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-252 (1986); *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  Moreover, the Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value."  *Evers v. Gen. Motors Corp.*, 770 F.2d 984,

986 (11th Cir. 1985). "The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment." *Henderson v. Carnival Corp.*, 125 F. Supp. 2d 1375, 1376 (S.D. Fla. 2000).

"*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006) (citation omitted).

**Discussion**

Benjamin's Amended Complaint, filed after his original complaint was dismissed without prejudice, sets forth the following counts, verbatim:

| | |
|---|---|
| Count 1 | Breach of Contract |
| Count 2 | Fraud |
| Count 3 | Violation of the Federal Equal Pay Act wage discrimination based on sex prohibited |
| Count 4 | Vicarious liability for unlawful harassment and Hostile work enviroment [sic] under Title VII |
| Count 5 | Violation of VII of the Civil Rights Act of 1964, 42 U.S.C.S. Discrimination in enforcing and making of Plaintiff's contract based on Race |
| Count 6 | Violation of Florida Equal Pay Act, § 725.07 which requires equal pay for equal services |
| Count 7 | Retaliation Title VII Section 704(a) |

Amended Complaint, DE 62.

**Count 3:  The Equal Pay Act Claim**

Plaintiff's claim of employment discrimination is based in part on the Equal Pay

Act (the "EPA") which provides in pertinent part:

> No employer ... shall discriminate, within any establishment in which
> such employees are employed, between employees on the basis of sex
> by paying wages to employees in such establishment at a rate less than
> the rate at which he pays wages to employees of the opposite sex in
> such establishment for equal work in jobs the performance of which
> requires equal skill, effort, and responsibility, and which are performed
> under similar working conditions, except where such payment is made
> pursuant to (i) a seniority system; (ii) a merit system; (iii) a system
> which measures earnings by quantity or quality of production; or (iv) a
> differential based on any other factor other than sex....

29 U.S.C. § 206(d).  A male employee establishes a prima facie case of an Equal Pay

Act violation by showing that his employer paid female employees different wages for

equal work for jobs which require "'equal skill, effort, and responsibility, and which

are performed under similar working conditions.'" *Irby v. Bittick*, 44 F.3d 949, 954

(11th Cir. 1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)

and 29 U.S.C. § 206(d)(1)).  If a disparity in pay between substantially similar jobs is

demonstrated, the burden shifts to the defendant to prove by a preponderance of the

evidence that the differential in pay is justified by one of the four exceptions set

forth in the statutes: "(i) a seniority system; (ii) a merit system; (iii) a system which

measures earnings by quantity or quality of production; or (iv) a differential based on

any other factor other than sex."  *Corning Glass Works*, 417 U.S. at 196 (quoting 29

U.S.C. § 206(d)(1)); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533

(11th Cir.1992)  (citing *Brock v. Georgia Southwestern College*, 765 F.2d 1026, 1036

(11th Cir. 1985)).  If the pay differential is justified, the defendant is absolved of

liability as a matter of law.

The success of plaintiff's suit under the EPA rests on the comparison of his pay

and job functions with those of persons whom he designates as "comparators."

*Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 588 (11th Cir. 1994).

**Benjamin's Comparators**

**Lorraine Tidwell**

The first comparator Benjamin identifies is Ms. Tidwell.  Defendant points out

that Ms. Tidwell is not a proper comparator because she was never an *employee* of

Holy Cross.  Undisputed evidence demonstrates that Ms. Tidwell was an *independent*

*contractor* to Holy Cross, who provided services on an as needed basis at contract

rates.

The EPA requires, among other things, that the plaintiff's comparators be

employees of the same employer.  29 U.S.C. § 206(d)(1) ("*No employer* having

employees subject to any provisions of this section *shall discriminate*, within any

establishment in which such employees are employed, *between employees* on the

basis of sex . . ."); *Mulhall*, 19 F.3d at 590.  Ms. Tidwell was not a Holy Cross

employee but instead was an independent contractor working on an as needed basis.

She received no benefits from Holy Cross.  In contrast, Plaintiff was a salaried

full-time employee who worked forty hours a week and received full benefits.  Based

upon the record presented, Ms. Tidwell cannot support Plaintiff's prima facie case because she was not an employee of Plaintiff's employer, and as an independent contractor, she  was not similarly situated.  *See, e.g., Taylor v. ADS, Inc.*, 327 F.3d 579, 581 (7th Cir. 2003) (district court properly granted summary judgment where employee presented only independent contractors as comparators); *Ahern v. Shinseki*, 2009 WL 1615402, *2 (D.R.I. June 9, 2009) (holding that it was "beyond dispute that Plaintiffs, as employees, were not similarly situated to the [independent contractors]"); *Barbour v. United Beechcraft*, 1998 WL 803417, *6 (N.D. Ill. Nov. 10, 1998)  (higher paid independent contractor and employee were not similarly situated and it was "impossible to compare the two"); *Nowlin v. Lake City,* 2012 WL 831498 (D.S.C. Jan. 25, 2012).

In an attempt to controvert these facts, Benjamin submitted the Affidavit of Ms. Tidwell.  The relevant statement made by Ms. Tidwell in her affidavit is that she "refused an offer to be the full-time EEG Tech at Holy Cross Hospital at an hourly rate of 30.00++ in 2008 from Joanne Steele."  Accepting this statement as true, it still does not establish that Holy Cross actually paid a similarly situated female employee, employed as a regular full-time EEG Tech, more than Benjamin for the same work. Ms. Tidwell admittedly was never an employee of Holy Cross and therefore never commenced work for Holy Cross at the $30++ rate.  Benjamin cannot compare himself with Ms. Tidwell for purposes of attempting to establish an equal pay violation.  *See McNierney v. McGraw-Hill, Inc.*, 919 F.Supp. 853, 860 (D. Md. 1995) (recognizing that

"[t]he EPA addresses *actually* paying different wages to similarly situated employees") (emphasis in original).

**Diana Corredor and Deborah Daley**

Benjamin also presents Ms. Corredor and Ms. Daley as comparators who worked in the Neurology Department as EEG Technicians and were compensated at higher hourly rates than he was.  The undisputed evidence, however, has established that both women worked as an EEG Technicians/PDP Associates.  While these women were paid more than Benjamin at a rate of $30.00 per hour, they are not proper comparators to Benjamin, because they were employed on a "per diem" or "PDP" basis.  Benjamin was a regular, full-time employee with benefits.  Ms. Corredor and Ms. Daley, as PDP Associates, were hired to work on an as needed basis and were not eligible for the health, dental, or life insurance benefits, paid time off and disability income benefits, and other benefit time for which regular full-time associates are eligible.  Undisputed Facts ¶ 9.  As a result, the hourly rates paid to PDP Associates are typically higher than the hourly rates paid to regular full-time associates.  *Id.* Based on the distinct compensation packages offered to regular full-time and PDP Associates, Ms. Daley and Ms. Corredor are not valid comparators for Benjamin. *Monroe-Lord v. Hytche*, 668 F.Supp. 979, 996 (D. Md. 1987) *aff'd*, 854 F.2d 1317 (4th Cir. 1988) (in the equal pay context plaintiff cannot compare herself to persons paid on a "per diem" basis, or who worked longer contracts, or who received lesser and different benefits).

<u>**Wanda Cardona**</u>

Wanda Cardona was identified by Benjamin in his deposition as someone who was paid $30 or more per hour who was not paid on a per diem basis.  The only evidence available on Ms. Cardona is Benjamin's statement that she started at Holy Cross after Benjamin left and she works as an Epilepsy Tech in the EP Lab.   Benjamin Depo. 34-35; *see also* Thompson Aff. ¶ 20.  Benjamin's testimony at his deposition suggests, however, that the position of an EP Tech involved more responsible duties that those of an EEG Tech:

> There was a patient that needed an EEG that he wanted hooked up for a long period of time.  Dr. Locatelli called me and asked me to do him a favor.  And I say it's a favor because it's a favor.  Meaning I don't do long-term EEGs.  It's not my job description to work as a EP tech.  I have already said, Holy Cross Hospital pays me less – paid me less than everyone else.  So based on this – on my position, of course, on my position, I was not going to do the job of a EP tech, which is long-term monitoring.

Benjamin Depo. 140.  No more information is provided other than the allegation that Ms. Cardona makes more money than Benjamin, and the fact that she works in another department and has a different title.  These facts are inadequate to establish a disparity in pay between substantially similar jobs.

Because Defendant has met its burden of demonstrating that it did not discriminate against Plaintiff relative to his rate of pay, and because Plaintiff has not presented evidence which raises a genuine issue of material fact that he was paid less than a female employee who performed equal work requiring equal skill, effort and

responsibility and performed under similar working conditions, summary judgment will be granted in Defendant's favor on Count 1.

**Count 4: Hostile Work Environment/Harassment**

In Count 4 Benjamin attempts to state a cause of action for "vicarious liability for unlawful harassment and hostile work environment under Title VII."  As the Court told Benjamin in its Order dismissing his initial complaint, in order to plead a hostile work environment claim under Title VII, Benjamin must allege (and support with plausible facts) that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) *the harassment was based on his membership in the protected group*; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability.  *Benjamin v. Holy Cross Hosp.*, 11-62142-CIV, 2012 WL 1900026 (S.D. Fla. May 24, 2012) citing *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010); *Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *see also Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 & n.2 (11th Cir. 2002) (noting that Title VII and § 1981 hostile work environment claims have the same elements and are subject to the same analytical framework).

All of Plaintiff's allegations in support of his hostile work environment claim relate to Dr. Locatelli harassing or threatening him about work related issues.  No

allegation relates the harassment to Plaintiff's membership in a protected class, *i.e.*, his race. "Title VII does not prohibit all forms of workplace harassment, but only harassment based on a person's membership in a class protected by Title VII." *Roof v. Howard University*, 501 F. Supp. 2d 108 (D.C. Cir. 2007).

Based on Benjamin's deposition testimony, it was undisputed that Dr. Locatelli never made comments about Benjamin's race. Undisputed Facts ¶ 29. When this was pointed out in Defendant's motion, Plaintiff filed the affidavit of Lauren Alexon, Benjamin's girlfriend. Benjamin Depo. 257. The principal statement made by Ms. Alexon, who claims to have visited Benjamin at Holy Cross on upwards of 200 times from 2010 to 2011, was that she overheard "derogatory racially insensitive statements about his race and color of his skin, intelligence, work ethic, cleanliness and threats against Mr. Benjamin by Dr. Locatelli." DE 90, ¶ 11. Ms. Alexon does not give any examples of what was said and she does not identify when or on how many occasions such statements were made.

This affidavit does not create a material question of fact as to whether Dr. Locatelli's harassment was based on Benjamin's membership in a protected group for a number of reasons. First, "[i]n order to overcome the heavy burden of summary judgment in a Title VII" action a plaintiff must "point to *specific* instances of racial hostility, and not offer mere conclusory allegations." *Buckhanon v. Huff & Associates Const. Co., Inc.*, 506 F. Supp. 2d 958, 966 n.5 (M.D. Ala. 2007) (emphasis in original). Affidavits filed in opposition to a motion for summary judgment must be based on

"concrete particulars" and not conclusory allegations. *Schwapp v. Town of Avon*, 118 F.3d 106, 110-111 (2d Cir. 1997) (finding that conclusory allegations of racism and a racially hostile working environment were properly disregarded by the district court in ruling on motion for summary judgment). *See also Broadway v. City of Montgomery*, 530 F.2d 657, 660 (5th Cir. 1976) (recognizing that an affidavit which provides only a "recital of unsupported allegations, conclusory in nature" is insufficient to create a genuine issue of material fact). Ms. Alexon's affidavit is conclusory.

More importantly, even accepting Ms. Alexon's conclusory assertions as true, there is no evidence they were directed at Benjamin or that he was ever aware of them. Benjamin testified that Dr. Locatelli never made any comments about his race and never used racial slurs of which he was aware. Undisputed Facts ¶¶ 29, 33. Benjamin cannot claim to have been harassed based on his race and yet never heard or was aware of any racially charged comments or actions taken by Dr. Locatelli. *Buckhanon v. Huff & Associates Const. Co., Inc.*, 506 F. Supp. 2d 958, 966 (M.D. Ala. 2007) (finding that testimony of witness to racial slurs and derogatory comments by supervisor was irrelevant to hostile work environment claim where plaintiffs testified that they were not aware of the supervisor's comments).

Furthermore, having testified that he was never aware of Dr. Locatelli making comments about his race or using racial slurs, Benjamin cannot now, in order to avoid summary judgment, present inconsistent evidence to attempt to create a genuine

issue of material fact.  Initially, it should be noted that Benjamin testified that Ms.

Alexon's relevant knowledge was limited to the content of four telephone calls, what

he personally told her, and what she saw of his work and work space.  As to such

matters, Benjamin testified:

> Q:    How many - how many occasions did she overhear one of your
>        discussions with Dr. Locatelli?
> A:    Somewhere in the nature of, I would say, about four or more.
>
>                              . . . . .
>
> Q:    Was she in the work area?
> A:    She was - I was at my house.
>
> Q:    Oh, these were calls that you received at home?
> A:    Yeah.
>
> Q:    Has she ever met Dr. Locatelli in person?
> A:    No.
>                              . . . . .
>
> Q:    Other than those four conversations, is there any other testimony that
>        you anticipate her providing?
> A:    I haven't talked - we haven't spoken in great detail yet, but I have
>        basically told her everything about the case.  So she's quite
>        knowledgeable about everything.
>
> Q:    But the knowledge she has, she received from you?
> A:    On some of them, yes.
>
> Q:    What does she have first-hand knowledge of?
> A:    She visited my lab.  She's come to meet me at my lab.
>
> Q:    She's never met Dr. Locatelli though, correct?
> A:    No.
>
> Q:    She's never seen you and Dr. Locatelli interact in person?
> A:    No.

Q:     Was she a witness to any of the events that you've alleged in the complaint, other than the four phone calls we discussed?

A:     No.

Q:     So what would she - would you anticipate her testifying to related to [sic] her visits to the lab?

A:     I don't know, but she's seen the lab.  She's seen how I work.

Benjamin Depo. 257-259.  Benjamin cannot rely on Ms. Alexon's conclusory affidavit, from what appears to be an interested witness, which is contradictory to his own testimony.  *See Flight Training, Inc. v. Tropical, Inc.*, 2007 WL 5117263, *9 (S.D. Fla. 2007) (finding that district court's authority to strike contradictory sworn statements extended to contradictory sworn statements of interested witness, recognizing that "[t]he same self-interest that might motivate a party to alter his or her statement in an affidavit to avoid summary judgment might similarly motivate an interested witness").  *Accord Ingram v. Lee,* 862 F.Supp. 368 (M.D. Ga. 1994), *aff'd*, 67 F.3d 314 (11th Cir.1995) (holding that an interested witness may not create a genuine issue of material fact by providing an affidavit, or sworn statement, that directly contradicts, without explanation, earlier deposition testimony); *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 521 (7th Cir. 1988) ("The purpose of summary judgment motions-to weed out unfounded claims, specious denials, and sham defenses-is served by a rule that prevents a party from creating issues of credibility by allowing one of its witnesses to contradict his own prior testimony" (internal quotations and citations omitted); *Garnac Grain Co., Inc. v. Blackley*, 932 F.2d 1563, 1568 (8th Cir. 1991) (extending the sham affidavit rule to non-party witnesses).

In considering a motion for summary judgment, a reviewing court must consider all the proffered evidence and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition. *Kennett-Murray Corporation v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980).  However, when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.  *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.,* 736 F.2d 656, 657 (11th Cir. 1984).  If a party, when met by a motion for summary judgment, attempts to repudiate his previous deposition testimony by affidavit, and no explanation for the discrepancy is made, a court may disregard the affidavit as a sham.  *See Lane v. Celotex Corp*. 782 F.2d 1526, 1529-30 (11th Cir. 1986).

The statement in Ms. Alexon's affidavit that she overheard Dr. Locatelli making racially insensitive statements about Benjamin, which substantively and circumstantially contradicts Benjamin's own testimony, is rejected as a basis for creating a issue of fact for trial on Benjamin's claim of racial harassment and a hostile work  environment.  Because Plaintiff has not raised a genuine issue of material fact relative to his claim that he was subjected to racial harassment and a hostile work environment under Title VII, summary judgment will be granted in Defendant's favor on Count 4.

## Count 5

In Count 5 of the Complaint, Benjamin attempts to assert a claim for violation of Section 1981 based on the $3.00 per hour difference in pay between he and his non-Black female colleagues.  Under either Title VII or Section 1981, Benjamin must demonstrate by a preponderance of the evidence that the actions taken by his employer were "more likely than not based on the consideration of impermissible factors" such as race, ethnicity, or national origin.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal quotation marks and citation omitted).  In so doing, the plaintiff may prove his claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination under the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under this paradigm, a plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case.  The elements of a race discrimination claim under § 1981 are the same as Title VII disparate treatment claims in the employment context.  *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002).  For a claim alleging disparate-treatment discrimination, a plaintiff makes out a prima facie case by showing (1) that he is a member of a protected group; (2) qualified for the position or entitled to the benefit sought; (3) subjected to adverse employment action; and (4) that the employer treated similarly situated employees outside the class more favorably.  *McDonnell Douglas*, 411 U.S. at 804; *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  The elements for a prima facie case will

necessarily vary depending on the factual situation and the type of employment action at issue.  See *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *Jones v. Firestone Tire & Rubber Co.*, 977 F.2d 527, 537 (11th Cir. 1992).

Benjamin purports to establish discriminatory intent by presenting evidence of disparate treatment.  Specifically, Benjamin claims that "similarly situated" women outside of his protected class were treated better than him in terms of their rate of pay.  However, as set forth above, while Ms. Tidwell, Ms. Corredor, and Ms. Daley may have performed the same job functions as Benjamin, they are not similarly situated to him.  Indeed, it was on the basis of their job classifications as independent contractor or per diem employees, and not their race or their sex, that these women were paid a higher hourly rate than Benjamin.  "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  *Holifield*, 115 F.3d at 1562.  There being no other inference of pay discrimination based on race, this claim fails as a matter of law, and summary judgment will be granted in Defendant's favor on Count 5.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) ("Our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision").

**Count 7: Retaliation**

In Count 7 Benjamin makes another attempt to state a cause of action for retaliatory discharge in violation of Title VII.  However, once again, he fails to plead the elements necessary to state such a claim.  As stated in this Court's previous Order dismissing Benjamin's complaint, "[t]o establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in a protected activity, (2) he suffered a materially adverse employment action, and (3) the protected activity was causally connected to the adverse employment action.  *Lara v. Raytheon Technical Service Co., LLC*, 2012 WL 1758604, *3 (11th Cir. May 17, 2012); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008)."  *Benjamin v. Holy Cross Hosp.*, 11-62142-CIV, 2012 WL 1900026, *3 (S.D. Fla. May 24, 2012).  While the issue of whether Benjamin engaged in protected activity might conceivably be disputed, the issue of whether or not he suffered an adverse employment action cannot be.

Although Benjamin claims he was terminated, the undisputed record evidence establishes that he resigned his employment.  Undisputed Facts ¶¶ 37-38.  While Benjamin's intention was to choose his date of departure after he had secured another job, hence the words "*impending*" resignation in the subject of the email, Holy Cross was not incorrect in interpreting the email as a resignation letter.  Benjamin Depo. 152-153.  That Holy Cross accepted his resignation "effective immediately" with two weeks pay, does not turn an "impending" resignation into a termination.  Absent allegations of constructive discharge, which are not present in

the Complaint, Benjamin's resignation cannot be deemed an adverse employment

action.  *See, e.g., Slattery v. Neumann*, 200 F. Supp. 2d 1367 (S.D. Fla. 2002)

(recognizing that a voluntary resignation does not constitute an adverse employment

action); *MacLean v. City of St. Petersburg*, 194 F. Supp. 2d 1290 (M.D. Fla. 2002)

(same).

Further, although Benjamin alleges in the Complaint that Holy Cross engaged in

post-employment retaliatory conduct by falsely reporting to the Agency for Workforce

Innovation that he was fired for misconduct, there is no record evidence of anyone at

Holy Cross having made such a statement.  To the contrary, the record evidence

reveals that Holy Cross provided no information to the Agency for Workforce

Innovation concerning Benjamin's separation, did not challenge Benjamin's award of

benefits, and did not otherwise interfere with Benjamin's receipt of unemployment

compensation benefits.  Undisputed Facts ¶ 40.  Accordingly, summary judgment will

be granted in Defendant's favor on Court 7 as to Benjamin's claim of retaliation in

violation of Title VII.

**State Claims**

Because summary judgment will be entered in favor of Holy Cross on all the

federal claims, the remaining potential state and common law claims will be

dismissed (without prejudice).  The Court declines to exercise supplemental

jurisdiction over these claims.  This Court derives its authority to decide Plaintiff's

federal claims from 28 U.S.C. § 1331, which provides that district courts have original

jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Federal courts are given the additional power to exercise supplemental jurisdiction over state law claims which "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, § 1367(c)(3) states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction...." *Id.* § 1367(c)(3).

The Eleventh Circuit has explicitly advised that a district court is well within its discretion to dismiss state law claims once the basis for original federal court jurisdiction no longer exists. *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000); *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 951 n.26 (11th Cir. 1997) ("After dismissing Panama's federal claims against the ... defendants, the district court correctly dismissed its remaining state law claims against these defendants"); *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 792 (11th Cir. 1991) (recognizing that trial court's decision to exercise pendant jurisdiction over state law claims is discretionary).

## Conclusion

The Eleventh Circuit has repeatedly held that "a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary

judgment." *See Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990) (citations omitted); *see also Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).  Because Benjamin failed to meet his burden to come forward with specific record evidence demonstrating the existence of a genuine issue of material fact, summary judgment will be entered in favor of Holy Cross.  Since the Court has determined that the federal claims serving as the basis for original federal court jurisdiction fail as a matter of law, the Court also concludes that any potential state and common law claims should be dismissed without prejudice so that Plaintiff may, if he chooses, pursue them in state court.  Therefore, because Holy Cross met its burden of pointing out to the district court that there is an absence of evidence to support Plaintiff's federal claims, and because Plaintiff failed to carry his responsive burden of demonstrating through affidavits or other evidence that there is indeed a material issue of fact that precludes summary judgment, there is no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiff.  *Clark*, 929 F.2d at 608. Therefore, in accordance with the findings made above, it is hereby

   **ORDERED AND ADJUDGED** that the Defendant's Motion for Summary Judgment Directed to All Claims Set Forth in Plaintiff's Amended Complaint [DE 73] **is granted in part and denied in part**.  It is granted as to all of Plaintiff's federal claims.  Any claims based on state or common law are dismissed without prejudice.  In accordance

with Fed. R. Civ. P. 58, final judgment will be entered by separate order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 29th day of March, 2013.

KENNETH A. MARRA
United States District Judge